# SEALED

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

17 - 1742

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF DELAWARE *ex rel.* [FILED UNDER SEAL], | **FILED UNDER SEAL** |
| Plaintiffs-Relators, | **DO NOT PLACE ON PACER** |
| | **CIVIL ACTION NO.:** |
| v. | |
| [FILED UNDER SEAL], | |
| Defendants. | |

## <u>RELATOR'S COMPLAINT</u>



2017 DEC -5 AM 8:35

## TABLE OF CONTENTS

I.      INTRODUCTION...................................................................................................1

II.     PARTIES ............................................................................................................3
        A. Government Plaintiffs .................................................................................3
        B. Relator......................................................................................................5
        C. Defendants ...............................................................................................5

III.    JURISDICTION AND VENUE.............................................................................6

IV.     THE FCA AND DFCRA .....................................................................................6

V.      BACKGROUND .................................................................................................8

VI.     DEFENDANTS' FRAUD ....................................................................................9
        A. Defendants Billed Medicare and Medicaid for Services Not Performed..........9
           1. Use of Billing Codes...............................................................................9
           2. Defendants Billed Medicare and Medicare for Inapplicable HCPCS Codes ..11
           3. Defendants Received Substantial Reimbursements from Medicare for HCPCS
              Codes Requiring an Interpretive Report ...............................................13
        B. Defendants Billed Medicare and Medicaid for Services that Were Not
           Properly Documented ...............................................................................15
        C. Representative Examples of Defendants' Fraud .............................................16

VII.    DEFENDANTS' FCA AND DFCRA LIABILITY .................................................18
        A. Defendants' Claims Were False....................................................................18
        B. Defendants' Misrepresentations Were Material to Payments from Medicare
           and Medicaid ...........................................................................................20

VIII.   RELATOR REPORTED DEFENDANT'S FRAUD .............................................20

IX.     COUNTS...........................................................................................................22

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF DELAWARE ex rel. NITIN VERMA, M.D., <br><br> Plaintiffs-Relators, <br><br> v. <br><br> ERANGA HATHTHOTUWA, M.D. and ERANGA CARDIOLOGY, P.A., <br><br> Defendants. | **FILED UNDER SEAL** <br><br> **DO NOT PLACE ON PACER** <br><br> **CIVIL ACTION NO.:** |

### RELATOR'S COMPLAINT

On behalf of the United States of America and the State of Delaware, Plaintiff-Relator Nitin Verma, M.D. ("Relator") brings this action against Eranga Haththotuwa, M.D. and Eranga Cardiology, P.A. (collectively, "Defendants") for violations of the False Claims Act, 31 U.S.C. §3729 et seq. and the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1201 et seq.

### I.   INTRODUCTION

1.      Dr. Eranga Haththotuwa operates a lucrative cardiology practice in Delaware, and a substantial percentage of his patients are Medicare and Medicaid beneficiaries.  Dr. Haththotuwa routinely provides a variety of cardiologic services to Medicare and Medicaid beneficiaries, including echocardiograms, electrocardiograms, stress tests, and ultrasounds.  With respect to many of these procedures, Medicare and Medicaid require that the provider generate an interpretive report.  For example, it is not enough for a provider to *perform* an echocardiogram; the provider must also generate a *report* interpreting the echocardiogram.  This, of course, makes sense: if the same provider or another provider needs to consult the results of the procedure in

connection with a patient's future medical needs, then there must be a report for the provider to consult.

2.      Relator previously worked at Dr. Haththotuwa's practice, and during his time there, witnessed Dr. Haththotuwa's routlinely decide against generating an interpretive report, even when Medicare and Medicaid billing requirements expressly required him to do so.  Dr. Haththotuwa's reasoning for failing to generate appropriate reports is simple:  doing so takes time that could be used to see additional patients and thus generate additional revenue.  By reallocating the time that he would otherwise have to spend on drafting reports, Dr. Haththotuwa was able to make more money.  Simply put, Dr. Haththotuwa made the intentional decision to elevate profits over both (1) patient safety and (2) adherence to Medicare and Medicaid billing requirements

3.      Even with respect to services that do not affirmatively require generation of an interpretive report, *all services* require that the provider appropriately document performance of the service.  A well-known mantra in the medical community, and a requirement that is equally applicable to Medicare and Medicaid billing, is that "if it's not documented it didn't happen."[1]  Contrary to this command, Dr. Haththotuwa routinely performed services (or claimed to have performed services) for which he did not maintain appropriate documentary support.

4.      Each claim presented to Medicare or Medicaid for which Dr. Haththotuwa failed to provide the billed services or failed to appropriately document performance of the billed services constitutes a false claim within the meaning of the federal False Claims Act and the Delaware False Claims and Reporting Act.

---

[1] See e.g. CMS, Medicare Resident and New Physician Training Video Transcript, at 10, available at               https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/MRNP_Transcript.pdf ("I don't think you can stress enough the importance of good documentation, because if it's not documented it didn't happen. If it didn't happen, then you don't get paid."),

## II. PARTIES

### A. Government Plaintiffs

5. The United States is a plaintiff to this action, which it brings on behalf of the Department of Health and Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS"), and federally funded healthcare programs, including Medicare, Medicaid, TRICARE, the Veterans Health Administration and Medicare Advantage and Managed Medicaid Plans.

6. Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq.; 42 U.S.C. §§ 426 and 426A, establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program. Medicare is a government health insurance program for people age 65 or older, certain disabled people under age 65, and people of all ages with end stage renal disease. Medicare is comprised of four parts; Medicare Parts A through D.

7. Part A of the Medicare program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care.

8. Medicare Part B, which is particularly relevant to the allegations raised herein, authorizes payment for physician and ancillary services, including laboratory and diagnostic tests and procedures. Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury. CMS contracts with private insurance companies to administer, process and pay Part B claims from the Federal Supplementary Medical Insurance Trust Fund. The private insurance companies that contract with CMS to provide these services are called Medicare Administrative Contractors, previously known as Part B carriers.

9. Part C of the Medicare program is also known as Medicare Advantage. Medicare Advantage Plans stand in place of Medicare Parts A and B and are offered by private companies approved by Medicare called Medicare Advantage Organizations. Medicare Advantage Plans may

also offer prescription drug benefits ordinarily available under Medicare Part D. These plans are typically less expensive for the consumer, but limit covered beneficiaries to a network of covered providers.

10.     Medicare Part D provides optional prescription drug coverage for Medicare beneficiaries.

11.     TRICARE is a federally funded program providing medical benefits to military personnel, their families, retired veterans, and reservists called to duty. See 32 C.F.R. §§ 19 et seq.

12.     The Veterans Health Administration is a federally funded and administered program which provides medical benefits to military veterans and their dependents.

13.     Medicaid is a government health insurance program funded jointly by the Federal and State governments, including Delaware. See 42 U.S.C. § 1396 et seq.

14.     Each state administers its own Medicaid program. However, each State program is governed by federal statutes, regulations and guidelines.

15.     The federal portion of each state's Medicaid payment – the Federal Medical Assistance Percentage – is based on that State's per capita income compared to the national average. During the relevant time period, the Federal Medical Assistance Percentage was between approximately 50% and 80%.

16.     Throughout the relevant time period, the services specified herein were provided to Medicaid beneficiaries in Delaware.

17.     The State of Delaware is a plaintiff to this action to the extent it provides funding with respect to provision of services to Medicaid beneficiaries in Delaware.

18.     Throughout the relevant time period, the services described herein were provided to beneficiaries of Medicare, Medicaid, Medicare Advantage and Managed Medicaid Plans,

4

TRICARE, the Veterans Administration, and other federally and state funded healthcare programs (collectively referred to herein as "government payers" or "government insurers").

**B.    Relator**

19.    Relator is a licensed physician and cardiologist.

20.    Relator previously worked at Eranga Cardiology between February 2015 and March 2017.

21.    Relator left Eranga Cardiology in March 2017 due to irreconcilable differences with Dr. Haththotuwa and to pursue other opportunities in the cardiology field.  Specifically, Relator did not believe that Dr. Haththotuwa operated Eranga Cardiology in compliance with legal and ethical obligations, including those at issue in this lawsuit.

22.    Relators has standing to bring this action pursuant to 31 U.S.C. §3730(b)(l) and Del. Code tit. 6, § 1203(b)(1).

23.    Relator's complaint is not based on public disclosures, within the meaning of 31 U.S.C. § 3730(e)(4)(A) and Del. Code tit. 6, § 1206(b), of the allegations or transactions discussed herein. Relator is an original source, within the meaning of 31 U.S.C. § 3730(e)(4)(B) and Del. Code tit. 6, § 1206(c), of the information provided herein.

24.    Prior to the filing of this action, and prior to any public disclosure within the meaning of 31 U.S.C. § 3730(e)(4)(A) and Del. Code tit. 6, § 1206(b), Relator voluntarily disclosed to the United States and the State of Delaware the information on which the allegations or transactions discussed herein are based.

**C.    Defendants**

25.    Dr. Eranga Haththotuwa owns and operates Eranga Cardiology through his company Eranga Cardiology, P.A.

5

26.     Eranga Cardiology, P.A. is professional association incorporated in Delaware, which maintains its principal place of business in Delaware.

## II.     JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over the federal claims in this action pursuant to 31 U.S.C. § 3732(a).

16.     This Court has subject matter jurisdiction over the state law claims in this action pursuant to 31 U.S.C. §3732(b) and 28 U.S.C. § 1367(a).

17.     This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. §3732(a) and because Defendants transact business in the District of Delaware.

18.     Venue is proper in this District pursuant to 31 U.S.C. §3732(a) because all Defendants can be found in, reside in, and transact business in the District of Delaware.  In addition, the FCA violations alleged herein occurred, and continue to occur, in this District.

## III.     THE FCA AND DFCRA

19.     The FCA "was passed in 1863 as a result of investigations of the fraudulent use of government funds during the Civil War." United States v. Neifert-White Co., 390 U.S. 228, 232 (1968).

20.     The FCA "establishes a scheme that permits either the Attorney General or a private party to initiate a civil action alleging fraud on the Government," U.S. ex rel. Eisenstein v. City of New York, New York, 556 U.S. 928, 932 (2009) (citations omitted), and "imposes significant penalties on those who defraud the Government." Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989, 1995 (2016).

21.     The FCA provides, inter alia, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly

6

makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

22.     The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).  Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

23.     Under the FCA, a person is liable for three times Government's actual damages and a civil monetary penalty for each FCA violation.  31 U.S.C. § 3729(a).

24.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 and 64 Fed. Reg. 47099, 47103 (1999), the civil monetary penalties under the FCA are $5,500 to $11,000 for violations occurring on or after September 29, 1999 but before November 2, 2015. See 28 C.F.R. § 85.3.

25.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 81 Fed. Reg. 42491 (2016) and the Civil Monetary Penalties Inflation Adjustment for 2017, 82 FR 9131-01 (2017), the civil monetary penalties under the FCA were adjusted to $10,957 to $21,916 for violations occurring on or after November 2, 2015 that are assessed after February 3, 2017. See 28 C.F.R. § 85.5.

26.     In 2000, the Delaware General Assembly enacted the DFCRA.  COMMERCIAL LAW—FALSE CLAIMS AND REPORTING ACT, 2000 Delaware Laws Ch. 370 (H.B. 543).

27.     The DFCRA is designed to "protect the State taxpayers from people who submit false claims to try to defraud them" and to "provide restitution of money taken from Government by fraud." Delaware Bill Summary, 2000 Reg. Sess. H.B. 543 (June 30, 2000).

28.     The DFCRA is modelled after its federal counterpart, and consequently, courts look to authorities applying the FCA when applying the DFCRA. State ex rel. Higgins v. SourceGas, LLC, 2012 WL 1721783, at *4 (Del. Super. Ct. May 15, 2012) ("[T]here is a dearth of Delaware authority interpreting the DFCRA. Because the DFCRA is modeled after the federal False Claims Act . . . the Court will look to the FCA's legislative history, as well as federal case law, for guidance in interpreting the DFCRA.") (footnote omitted).

29.     Under the DFCRA, a person is liable for three times the State's actual damages and a civil monetary penalty between $5,500 and $11,000 for each DFCRA violation. Del. Code Ann. tit. 6, § 1201(a).

## IV.     BACKGROUND

30.     Dr. Haththotuwa began practicing cardiology in or around 2000.

31.     In or around July 2013, Dr. Haththotuwa opened Eranga Cardiology.

32.     Eranga Cardiology is a cardiology practice with three locations in Delaware in Dover, Milford, and Georgetown.

33.     Currently, Dr. Haththotuwa is the sole cardiologist practicing at Eranga Cardiology.

34.     At times, Dr. Haththotuwa has hired other cardiologists, including Relator, to work at Eranga Cardiology.

35.     Eranga Cardiology offers a full range of cardiologic procedures, including echocardiograms, electrocardiograms, stress tests, and ultrasounds.

36.     Eranga Cardiology accepts patients with Medicare or Medicaid coverage.

37.     A substantial portion of patients at Eranga Cardiology are Medicare and Medicaid beneficiaries.

38.     Based on his time working at Eranga Cardiology, Relator estimates that 40-45% of patients at Eranga Cardiology are Medicare beneficiaries, including both patients receiving coverage through traditional Medicare and patients receiving coverage through Medicare Advantage plans.

39.     Based on his time working at Eranga Cardiology, Relator estimates that 30-35% of patients at Eranga Cardiology are Medicaid beneficiaries.

40.     Thus, in sum, Relator estimates that 70-80% of patients at Eranga Cardiology are Medicare or Medicaid beneficiaries.

## V.     DEFENDANTS' FRAUD

41.     During his time at Eranga Cardiology, Relator witnessed Defendants' below-describe false and fraudulent conduct firsthand.

### A. Defendants Billed Medicare and Medicaid for Services Not Performed.

#### 1.     Use of Billing Codes

42.     For billing purposes, providers indicate the type of service provided to a Medicare or Medicaid beneficiary using a code known as a Healthcare Common Procedure Coding System ("HCPCS") code, which are sometimes referred to by their private practice counterpart, Current Procedural Terminology ("CPT") codes. See generally 45 C.F.R. § 162.1002.

43.     HCPCS "is a uniform coding system consisting of descriptive terms and identifying codes for reporting medical services, procedures, products, and supplies."[2]

---

[2]   HHS-OIG, QUESTIONABLE BILLING FOR MEDICARE PART B CLINICAL LABORATORY SERVICES (Aug. 2014), available at https://oig.hhs.gov/oei/reports/oei-03-11-00730.pdf; see also Walkwell Int'l Labs., Inc. v. Nordian Admin. Servs., LLC, 2014 WL 174948,

44. Specifically, a provider submits an electronic or paper version of CMS Form 1500.

45. As illustrated below, the form requires the provider to identify one or more HCPCS

codes that correlate with the services provided to the patient:

46. Each HCPCS correlates with a description of the service provided.

47. For example, HCPCS 93010 is for a "[r]outine electrocardiogram (EKG) using at least 12 leads with interpretation and report."

48. A provider may only identify HCPCS codes on CMS Form 1500 for services that were actually provided to the patient.

49. When submitting CMS Form 1500, providers expressly certify that "the foregoing information is true, accurate and complete" and that the provider "understand[s] that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims,

_____

at *1 (D. Idaho Jan. 13, 2014) ("To obtain payment, the supplier submits a claim with . . . the Healthcare Common Procedure Coding System . . . code or codes that identify the specific type of [service]provided to the beneficiary. Assuming Medicare eligibility, coverage, and/or other payment requirements are satisfied, Medicare pays the supplier the amount associated with the reported HCPCS code(s)."); United States v. Trikha, 2007 WL 1752182, at *1 (S.D. Ill. June 15, 2007) ("[B]oth Medicare and Medicaid require provider billing claims to include Current Procedural Terminology . . . codes to identify the service performed by the provider.").

statements, or documents, or concealment of a material fact, many be prosecuted under applicable

Federal or State laws."

50.    Employing the example above, a provider consequently cannot bill for HCPCS

93010 if the provider does not actually perform an electrocardiogram.

51.    If a provider identifies HCPCS codes for services that were not provided, the

certification on CMS Form 1500 is false.

### 2.    Defendants Billed Medicare and Medicare for Inapplicable HCPCS Codes.

52.    During his time at Eranga Cardiology, Relator witnessed Defendants' billing

Medicare and Medicaid without providing the underlying services required to bill the HCPCS

codes for which Defendants sought reimbursement.

53.    Defendants routinely billed Medicare for the following HCPCS codes:

| HCPCS Code | Code Description |
| --- | --- |
| 93010 | Routine electrocardiogram (EKG) using at least 12 leads with interpretation and report |
| 93000 | Routine EKG using at least 12 leads including interpretation and report |
| 93015 | Exercise or drug-induced heart and blood vessel stress test with EKG monitoring, physician supervision, interpretation, and report |
| 93227 | Heart rhythm tracing, analysis, and interpretation of 48-hour EKG |
| 93280 | Evaluation, testing, and programming adjustment of permanent dual lead pacemaker system with physician analysis, review, and report |
| 93284 | Evaluation, testing, and programming adjustment of permanent multiple lead cardioverter-defibrillator including physician analysis, review, and report |
| 93283 | Evaluation, testing, and programming adjustment of permanent dual lead cardioverter-defibrillator including physician analysis, review, and report |

54.    Based on Relator's time working at Eranga Cardiology, Relator knows that

Defendants routinely billed Medicaid for these codes.

55.    All of these HCPCS codes require both (1) performance of the underlying service

and (2) generation of an interpretive report.

11

56.     However, Defendants billed Medicare for these HCPCS codes *without* generating an interpretive report of the underlying service.

57.     For example, Dr. Haththotuwa would perform an electrocardiogram upon a Medicare or Medicaid beneficiary but would not generate any report interpreting the results of the electrocardiogram.

58.     Dr. Haththotuwa's reason for not doing so was simple: generating an interpretive report takes time that could be used to see additional patients and thus generate additional revenue.

59.     Consequently, by reallocating the time that he would otherwise have to spend on maintaining medical records, Dr. Haththotuwa was able to make more money.

60.     Relator estimates that completion of an appropriate interpretive report would take approximately 25-30 minutes.

61.     Instead of completing appropriate interpretive reports as required by the above-listed HCPCS codes, Dr. Haththotuwa elected to schedule as many revenue producing procedures in a day as possible.

62.     In addition to failing to satisfy the above-listed HCPCS codes, the failure to generate an interpretive report results in substantial harm to patients.

63.     For example, a future medical provider (including Dr. Haththotuwa with respect to return patients) would be unable to refer to the report.

64.     Additionally, Dr. Haththotuwa could not have provided an interpretive report to referring physicians for their reference with respect to the provision of other services. This could endanger patients if the interpretive report would have affected the services provided by referring physicians.

### 3. Defendants Received Substantial Reimbursements from Medicare for HCPCS Codes Requiring an Interpretive Report.

65.     Medical providers bill Medicare using a national provider identifier ("NPI"") number, which is a "standard unique health identifier for health care providers." 45 CFR §162.406; see United States v. Gonzalez, 560 F. App'x 554, 556 (6th Cir. 2014) (describing NPI as "unique identifiers issued by the [CMS] to healthcare providers").

66.     The NPI assigned to Dr. Haththotuwa is 1669477618.

67.     As demonstrated by the below Medicare reimbursement data tied to NPI 1669477618, Defendants routinely billed Medicare for HCPCS codes that required generation of an interpretive report.

| Year | HCPCS | HCPCS description | # of Services | Average Medicare Payment Amount | Total Medicare Payment Amount |
|---|---|---|---|---|---|
| 2012 | 93010 | Routine electrocardiogram (EKG) using at least 12 leads with interpretation and report | 646 | $6.81 | $4,396.98 |
|  | 93000 | Routine EKG using at least 12 leads including interpretation and report | 1,200 | $14.54 | $17,452.58 |
|  | 93015 | Exercise or drug-induced heart and blood vessel stress test with EKG monitoring, physician supervision, interpretation, and report | 29 | $72.95 | $2,115.55 |
|  | 93227 | Heart rhythm tracing, analysis, and interpretation of 48-hour EKG | 16 | $21.62 | $345.92 |
|  |  | **SUBTOTAL FOR 2012** | 1,891 |  | $24,311.03 |
| 2013 | 93280 | Evaluation, testing, and programming adjustment of permanent dual lead pacemaker system with physician analysis, review, and report | 28 | $45.93 | $1,286.02 |
|  | 93000 | Routine EKG using at least 12 leads including interpretation and report | 980 | $13.85 | $13,572.55 |
|  | 93010 | Routine electrocardiogram (EKG) using at least 12 leads with interpretation and report | 1224 | $6.41 | $7,841.68 |
|  | 93227 | Heart rhythm tracing, analysis, and interpretation of 48-hour EKG | 23 | $20.67 | $475.52 |
|  | 93015 | Exercise or drug-induced heart and blood vessel stress test with EKG monitoring, physician supervision, interpretation, and report | 270 | $56.15 | $15,160.35 |

13

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  | 93284 | Evaluation, testing, and programming adjustment of permanent multiple lead cardioverter-defibrillator including physician analysis, review, and report | 16 | $70.55 | $1,128.85 |
|  |  | **SUBTOTAL FOR 2013** | 2,541 |  | $39,464.97 |
| 2014 | 93010 | Routine electrocardiogram (EKG) using at least 12 leads with interpretation and report | 1,372 | $6.71 | $9,202.44 |
|  | 93000 | Routine EKG using at least 12 leads including interpretation and report | 1,035 | $12.88 | $13,331.69 |
|  | 93227 | Heart rhythm tracing, analysis, and interpretation of 48-hour EKG | 43 | $21.00 | $903.14 |
|  | 93280 | Evaluation, testing, and programming adjustment of permanent dual lead pacemaker system with physician analysis, review, and report | 30 | $45.01 | $1,350.41 |
|  | 93283 | Evaluation, testing, and programming adjustment of permanent dual lead cardioverter-defibrillator including physician analysis, review, and report | 18 | $60.80 | $1,094.39 |
|  | 93015 | Exercise or drug-induced heart and blood vessel stress test with EKG monitoring, physician supervision, interpretation, and report | 274 | $53.25 | $14,591.60 |
|  |  | **SUBTOTAL FOR 2014** | 2,772 |  | $40,473.67 |
| 2015 | 93227 | Heart rhythm tracing, analysis, and interpretation of 48-hour EKG | 64 | $20.10 | $1,286.64 |
|  | 93010 | Routine electrocardiogram (EKG) using at least 12 leads with interpretation and report | 868 | $6.53 | $5,664.35 |
|  | 93280 | Evaluation, testing, and programming adjustment of permanent dual lead pacemaker system with physician analysis, review, and report | 26 | $45.62 | $1,186.19 |
|  | 93015 | Exercise or drug-induced heart and blood vessel stress test with EKG monitoring, physician supervision, interpretation, and report | 277 | $51.39 | $14,235.42 |
|  | 93000 | Routine EKG using at least 12 leads including interpretation and report | 1,167 | $12.92 | $15,079.02 |
|  |  | **SUBTOTAL FOR 2015** | 2,402 |  | $37,451 |
| 2016 |  | **SUBTOTAL FOR 2016 (combined all HCPCS based on 2015 data)** | 2,402 |  | $37,451 |
| 2017 |  | **SUBTOTAL FOR 2017 (first 7 months, combined all HCPSS based on 2015)** | 1,401 |  | $24,846 |
| 2012 - |  |  | 13,409 |  | $203,977.67 |

14

| Aug. 2017 | ██████████████████ | | ████████████ | | |

68.     In the above table, the actual data is limited to Medicare reimbursement for 2012 to 2015 and is provided to serve as a representative example. The data estimated for 2016 and 2017 is based on the data from 2015.

69.     This data only includes patients who received coverage through traditional Medicare and does *not* include patients who received coverage through Medicare Advantage plans.

70.     This data does not include the substantial number of Defendants' patients who received coverage through Medicaid.

**B. Defendants Billed Medicare and Medicaid for Services that Were Not Properly Documented.**

71.     In addition to failing to complete interpretive reports when required by the billed HCPCS code, Defendants more broadly failed to document services provided to Medicare and Medicaid beneficiaries.

72.     When submitting CMS Form 1500, providers certify that they will "keep such records as are necessary to disclose fully the extent of services provided to individuals . . . and to furnish information regarding any payments claims for providing such services."

73.     Medicare guidance makes clear that providers are required to maintain appropriate documentation so as to permit Medicare to review the underlying documentation to ensure that the billed services were provided and otherwise comply with Medicare coverage and reimbursement requirements:

> Physician Documentation Maintain accurate and complete medical records and documentation of the services you provide. Also, ensure your documentation supports the claims you submit for payment. Good documentation ensures your patients receive appropriate care from you and other providers who may rely on your records for patients' medical histories. The Medicare Program may review

15

beneficiaries' medical records. **Good documentation helps you address challenges raised about the integrity of your claims.** You may have heard the saying regarding malpractice litigation: "If you didn't document it, it's the same as if you didn't do it." The same can be said for Medicare billing.[3]

74.     The Medicare Program Integrity Manual ("MPIM") authorizes CMS, and the third-parties with whom CMS contracts to administer Medicare, to request "additional documentation" because they "may not be able to make a determination on a claim they have chosen for review based upon the information on the claim, its attachments, or the billing history found in claims processing system."[4]

75.     The MPIM further explains that "additional documentation" may include "[c]linical evaluations, physician evaluations, consultations, progress notes, physician's office records, hospital records, nursing home records, home health agency records, records from other healthcare professionals and test reports." Id.

### C. Representative Examples of Defendants' Fraud.

76.     On April 17, 2013, Dr. Haththotuwa performed an echocardiogram on patient Rosalie Anderson.

77.     At the time Dr. Haththotuwa provided these services, Rosalie Anderson was a Medicaid beneficiary.

78.     Contrary to the above-described requirements, Dr. Haththotuwa did not generate an interpretive report for the echocardiogram he performed on Rosalie Anderson.

79.     Nonetheless, Dr. Haththotuwa billed Medicaid for the echocardiogram he performed on Rosalie Anderson.

---

[3] *Supra* n. ___ (emphasis added).
[4]     CMS, Medicare Program Integrity Manual, at § 3.2.3, available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/pim83c03.pdf.

80.     Upon information and belief, Dr. Haththotuwa received reimbursement from Medicaid for the echocardiogram he performed on Rosalie Anderson.

81.     On June 4, 2014, Dr. Haththotuwa performed an echocardiogram on patient Lois Hopkins.

82.     On July 29, 2015, Dr. Haththotuwa performed another echocardiogram on patient Lois Hopkins.

83.     At the time Dr. Haththotuwa provided these services patient, Lois Hopkins was a Medicare beneficiary.

84.     Contrary to the above-described requirements, Dr. Haththotuwa did not generate an interpretive report for the echocardiograms he performed on Lois Hopkins.

85.     Nonetheless, Dr. Haththotuwa billed Medicare the echocardiograms he performed on Lois Hopkins.

86.     Upon information and belief, Dr. Haththotuwa received reimbursement from Medicare for the echocardiograms he performed on Lois Hopkins.

87.     On May 22, 2014, Dr. Haththotuwa performed an echocardiogram on patient Thelma Gibson.

88.     On May 27, 2015, Dr. Haththotuwa performed another echocardiogram on patient Thelma Gibson.

89.     At the time Dr. Haththotuwa provided these services, Thelma Gibson was a Medicare beneficiary.

90.     Contrary to the above-described requirements, Dr. Haththotuwa did not generate an interpretive report for the echocardiograms he performed on Thelma Gibson.

91.     Nonetheless, Dr. Haththotuwa billed Medicare the echocardiograms he performed on Thelma Gibson.

92.     Upon information and belief, Dr. Haththotuwa received reimbursement from Medicare for the echocardiograms he performed on Thelma Gibson.

93.     On March 7, 2015, Dr. Haththotuwa performed an echocardiogram on patient Dana Hodge Sr.

94.     At the time Dr. Haththotuwa provided these services, Dana Hodge Sr. was a Medicare beneficiary.

95.     Contrary to the above-described requirements, Dr. Haththotuwa did not generate an interpretive report for the echocardiogram he performed on Dana Hodge Sr.

96.     Nonetheless, Dr. Haththotuwa billed Medicare the echocardiogram he performed on Dana Hodge Sr.

97.     Upon information and belief, Dr. Haththotuwa received reimbursement from Medicare for the echocardiogram he performed on Dana Hodge Sr.

## VI.     DEFENDANTS' FCA AND DFCRA LIABILITY

### A. Defendants' Claims Were False

98.     A reimbursement claim to Medicare or Medicaid for services that were not provided constitutes a false claim within the meaning of the FCA and the DFCRA.

99.     Courts have repeatedly recognized that false claims liability can be predicated upon the presentment of a reimbursement claim to Medicare or Medicaid for services that were not provided. See United States ex rel. Presser v. Acacia Mental Health Clinic, LLC, 836 F.3d 770, 778 (7th Cir. 2016) (finding that a relator's "complaint sufficiently alleges that the defendants misused a billing code and falsely represented to the state and federal governments that a certain

18

treatment was given by certain medical staff when in fact it was not"); Hill v. Morehouse Med. Assocs., Inc., 2003 WL 22019936 (11th Cir. Aug. 15, 2003) (similar); United States ex rel. Ryan v. Lederman, 2014 WL 1910096, at \*6 (E.D.N.Y. May 13, 2014) (finding FCA liability where the Government alleged that a provider "billed for services under certain CPTs when, in actuality, he was performing different services"); U.S. ex rel. Harris v. Bernad, 275 F. Supp. 2d 1, 4 (D.D.C. 2003) (finding that the Government sufficiently pleaded FCA claims where it alleged that defendants "submitted claims with CPT codes that represented a level of care higher than the defendants actually provided"); United States v. Quad City Prosthetic, Inc., 2011 WL 3273142, at \*6 (C.D. Ill. Aug. 1, 2011) (similar).

100.    Likewise, Medicare and Medicaid reimbursement claims without appropriate documentation showing that the underlying services were actually performed constitute false claims within the meaning of the FCA and the DFCRA. See United States ex rel. Trim v. McKean, 31 F. Supp. 2d 1308, 1312 (W.D. Okla. 1998) (imposing FCA liability where a provider's practice was "to code based on the 'service rendered' without regard to what was documented"); United States v. Caris Life Scis., Inc., 2013 WL 11579021, at \*8 (N.D. Tex. Oct. 23, 2013) (finding that relators sufficiently pleaded FCA claims based, in relevant part, on allegations that a defendant "knowingly submit[ted] undocumented claims to Medicare, and thus bill[ed] Medicare for services it had no evidence of providing").

101.    As illustrated by the representative examples above, Defendants presented false claims to Medicare and Medicaid in the form of (1) billing for services that require generation of an interpretive report without preparing an interpretive report and (2) billing for services without maintaining appropriate documentation to substantiate performance of the billed service.

**B. Defendants' Misrepresentations Were Material to Payments from Medicare and Medicaid.**

102.    "Material" within the meaning of the FCA and the DFCRAA means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4); Del. Code Ann. tit. 6, § 1202(4).

103.    Medicare would not have paid Defendants' reimbursement requests for HCPCS codes that required generation of an interpretive report if it had known that Defendants were not actually generating an interpretive report.

104.    Medicaid would not have paid Defendants' reimbursement requests for HCPCS codes that required generation of an interpretive report if it had known that Defendants were not actually generating an interpretive report.

105.    Medicare would not have paid Defendants' reimbursement requests for services had it known that Defendants were not maintaining appropriate documentation to substantiate performance of the billed services.

106.    Medicaid would not have paid Defendants' reimbursement requests for services had it known that Defendants were not maintaining appropriate documentation to substantiate performance of the billed services.

107.    As a matter of common sense, the Government would not pay for services that it was not receiving. See United States v. Triple Canopy, Inc., 857 F.3d 174, 178 (4th Cir. 2017), cert. dismissed, 2017 WL 3536480 (U.S. Oct. 20, 2017) ("Applying the standard, we found [the defendant's] omissions material for two reasons: common sense and [the defendant']'s own actions in covering up the noncompliance.").

108.     This is particularly true given that Medicare and Medicaid have repeatedly recognized that one of the most common types of Medicare and Medicaid fraud is billing for services that were not actually renders, *i.e.* billing for HCPCS code where the services described in the HCPCS code description were not provided to the patient. See HHS-OIG, Publication of the OIG Compliance Program Guidance for Third-Party Medical Billing Companies, 63 FR 70138, 70142 n. 27, 1998 WL 878453 (Dec. 18, 1998) ("Among the risk areas the OIG has identified as particularly problematic are . . . [b]illing for items or services not actually documented . . . Billing for items or services not actually documented involves submitting a claim that cannot be substantiated in the documentation.").

109.     For example, a recent CMS publication advises providers:

> Accurate Coding and Billing
> As a physician, payers trust you to provide necessary, cost-effective, and quality care. You exert significant influence over what services your patients receive. You control the documentation describing what services they actually received, and your documentation serves as the basis for claims sent to insurers for services you provided. Generally, the Federal Government pays claims based solely on your representations in the claims documents.
> When you submit a claim for services performed for a Medicare patient, you are filing a bill with the Federal Government and certifying you earned the payment requested and complied with the billing requirements. If you knew or should have known the submitted claim was false, then the attempt to collect payment constitutes a violation.
> ***Examples of improper claims include . . . [b]illing for services that you did not actually render*[.][5]

---

[5] See e.g. CMS, Avoiding Medicare Fraud & Abuse: A Roadmap for Physicians, at 5 (Aug. 2016), available at https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/Avoiding_Medicare_FandA_Physicians_FactSheet_905645.pdf (emphasis added).

21

110. Each HCPCS code serves as the basis for determining the reimbursement amount that a provider will receive from Medicare or Medicaid.[6]

111. As a result, the services for which a provider bills has a direct effect on the amount of reimbursement than a provider will receive from Medicare or Medicaid.

## VII. RELATOR REPORTED DEFENDANTS' FRAUD.

112. During his time working at Eranga Cardiology, Relator became increasingly concerned about Defendant's above-described false and fraudulent conduct.

113. Relator relayed his concerns to management at Eranga Cardiology, including to Dr. Haththotuwa.

114. Relator's concerns went unaddressed, ultimate prompting Relator to announce that he was leaving Eranga Cardiology in March 2017.

115. Around the same time as he left Eranga Cardiology, Relator contacted the Delaware Department of Justice to report Defendants' above-described fraud.

116. In a letter dated May 9, 2017, the Delaware Department of Justice informed Relator that it "opened an investigation based on your referral."

## VIII. COUNTS

### COUNT I – DR. HATHTHOTUWA
### Violation of the False Claims Act - 31 U.S.C. §3729(a)(1)(A)

117. Relator repeats and re-alleges each and every allegation contained in paragraphs 1 through 116 above as though fully set forth herein.

---

[6] See generally CMS, How to Use the Searchable Medicare Physician Fee Schedule (MPFS) (April 2016), available at https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/How_to_MPFS_Booklet_ICN901344.pdf.

118. In violation of 31 U.S.C. § 3729(a)(1)(A), Dr. Haththotuwa knowingly presented or caused the presentment of false or fraudulent claims for payment or approval to (1) the United States and/or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the United States.

119. The false statements made by Dr. Haththotuwa had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

120. Dr. Haththotuwa made fraudulent and false statements with actual knowledge of the falsity of its statements, with deliberate ignorance of the falsity of its statements, or with reckless disregard as to the falsity of its statements.

121. By virtue of the false or fraudulent claims that Dr. Haththotuwa presented or caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT II – DR. HATHTHOTUWA
## Violation of the False Claims Act - 31 U.S.C. §3729(a)(1)(B)

122. Relator repeats and re-alleges each and every allegation contained in paragraphs 1 through 116 above as though fully set forth herein.

123. In violation of 31 U.S.C. § 3729(a)(1)(B), Dr. Haththotuwa knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to (1) the United States or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the United States.

124. The false records and statements made by Dr. Haththotuwa had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

23

125.    By virtue of the false records and statements made by Dr. Haththotuwa, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT III – DR. HATHTHOTUWA
## Violation of the Delaware False Claims and Reporting Act, Del. Code tit. 6, § 1201(a)(1)

126.    Relator repeats and re-alleges each and every allegation contained in paragraphs 1 through 116 above as though fully set forth herein.

127.    In violation of Del. Code tit. 6, § 1201(a)(1), Dr. Haththotuwa knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to (1) the State of Delaware or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the State of Delaware.

128.    The false statements made by Dr. Haththotuwa had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

129.    Dr. Haththotuwa made fraudulent and false statements with actual knowledge of the falsity of its statements, with deliberate ignorance of the falsity of its statements, or with reckless disregard as to the falsity of its statements.

130.    By virtue of the false or fraudulent claims that Dr. Haththotuwa presented or caused to be presented, the State of Delaware has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT IV – DR. HATHTHOTUWA
## Violation of the Delaware False Claims and Reporting Act, Del. Code tit. 6, § 1201(a)(2)

131.    Relator repeats and re-alleges each and every allegation contained in paragraphs 1 through 116 above as though fully set forth herein.

132.   In violation of Del. Code tit. 6, § 1201(a)(2), Dr. Haththotuwa knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to (1) the State of Delaware (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the State of Delaware.

133.   The false records and statements made by Dr. Haththotuwa had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

134.   By virtue of the false records and statements made by Dr. Haththotuwa, the State of Delaware has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT V – ERANGA CARDIOLOGY, P.A.
### Violation of the False Claims Act - 31 U.S.C. §3729(a)(1)(A)

135.   Relator repeats and re-alleges each and every allegation contained in paragraphs 1 through 116 above as though fully set forth herein.

136.   In violation of 31 U.S.C. § 3729(a)(1)(A), Eranga Cardiology, P.A. knowingly presented or caused the presentment of false or fraudulent claims for payment or approval to (1) officials of the United States and/or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the United States.

137.   The false statements made by Eranga Cardiology, P.A. had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

138.   Eranga Cardiology, P.A. made fraudulent and false statements with actual knowledge of the falsity of its statements, with deliberate ignorance of the falsity of its statements, or with reckless disregard as to the falsity of its statements.

139. By virtue of the false or fraudulent claims that Eranga Cardiology, P.A. presented or caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT VI – ERANGA CARDIOLOGY, P.A.
### Violation of the False Claims Act - 31 U.S.C. §3729(a)(1)(B)

140. Relator repeats and re-alleges each and every allegation contained in paragraphs 1 through 116 above as though fully set forth herein.

141. In violation of 31 U.S.C. § 3729(a)(1)(B), Eranga Cardiology, P.A. knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to (1) the United States or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the United States.

142. The false records and statements made by Eranga Cardiology, P.A. had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

143. By virtue of the false records and statements made by Eranga Cardiology, P.A., the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT VII – ERANGA CARDIOLOGY, P.A.
### Violation of the Delaware False Claims and Reporting Act, Del. Code tit. 6, § 1201(a)(1)

144. Relator repeats and re-alleges each and every allegation contained in paragraphs 1 through 116 above as though fully set forth herein.

145. In violation of Del. Code tit. 6, § 1201(a)(1), Eranga Cardiology, P.A. knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to (1) the State of Delaware or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the State of Delaware.

146. The false statements made by Eranga Cardiology, P.A. had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

147. Eranga Cardiology, P.A. made fraudulent and false statements with actual knowledge of the falsity of its statements, with deliberate ignorance of the falsity of its statements, or with reckless disregard as to the falsity of its statements.

148. By virtue of the false or fraudulent claims that Eranga Cardiology, P.A. presented or caused to be presented, the State of Delaware has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT VIII – ERANGA CARDIOLOGY, P.A.
### Violation of the Delaware False Claims and Reporting Act, Del. Code tit. 6, § 1201(a)(2)

149. Relator repeats and re-alleges each and every allegation contained in paragraphs 1 through 116above as though fully set forth herein.

150. In violation of Del. Code tit. 6, § 1201(a)(2), Eranga Cardiology, P.A. knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to (1) the State of Delaware or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the State of Delaware.

151. The false records and statements made by Eranga Cardiology, P.A. had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

152. By virtue of the false records and statements made by Eranga Cardiology, P.A., the State of Delaware has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

27

## REQUESTS FOR RELIEF

WHEREFORE, Relator, on behalf of the United States and the State of Delaware demands that judgment be entered in the favor of Relator and against Defendants for:

a) Three times the amount of damages, including consequential damages, to the United States and the State of Delaware;

b) Civil penalties of (1) no more than $11,000 and no less than $5,500 for each violation of the FCA that occurred after September 29, 1999 but before November 2, 2015 and (2) no more than $21,916 and no less than $10,957 for each violation of the FCA that occurred on or after November 2, 2015;

c) Civil penalties of no more than $5,500 and no less than $11,000 for each violation of the DFCRA;

d) Any other recoveries or relief provided for under the FCA and DFCRA;

e) Relator's receipt of the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States and the State of Delaware;

f) Reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs; and

g) Such other relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury on all issues so triable.

Dated: December 1, 2017                **BERGER & MONTAGUE, P.C.**

                                       */s/   Daniel R. Miller*

                                       Daniel R. Miller (DE Bar No. 3169)
                                       1622 Locust Street
                                       Philadelphia, PA  19103-6305

28

Telephone: (215) 875-3000
Facsimile: (215) 875-4604
dmiller@bm.net